Darby Jon OPSAHL, petitioner,
Appellant,

v.

STATE of Minnesota, Respondent.

No. A03–298.

Supreme Court of Minnesota.

April 8, 2004.

Edward B. Magarian, Christopher A. Young, Shari Jerde, Heather D. Redmond, Thomas M. Jancik, Dorsey & Whitney LLP, Minneapolis, MN, for Appellant.

Mike Hatch, Attorney General, St. Paul, MN, Michael K. Junge, McLeod County Attorney, Amy E. Olson, Asst. McLeod County Attorney, Glencoe, MN, for Respondent.

## OPINION

MEYER, Justice.

This case comes to us from the district court's denial of an evidentiary hearing for post-conviction relief. On October 23, 1992, a jury convicted appellant, Darby Jon Opsahl, of the 1986 murder of Margaret Rehmann. The state based its case on statements Opsahl made to police during the initial investigation of the crime and on testimony of several of Opsahl's acquaintances who claimed to have heard Opsahl make certain admissions about the murder. We affirmed. Opsahl then brought this claim for postconviction relief. In support of his claim, Opsahl presented affidavits that allege several state witnesses provided fabricated or unreliable trial testimony, with some of the trial witnesses claiming that the prosecuting attorney pressured them into testifying falsely. The district court denied postconviction relief without granting an evidentiary hearing. We reverse and remand for a hearing.

On the afternoon of October 16, 1986, Margaret Rehmann was murdered in her home in rural Lester Prairie, Minnesota. The McLeod County Sheriff's Department conducted an extensive investigation but was initially unable to trace the crime to a suspect. Nearly a year later, Jeff Olson informed police that he believed Opsahl and John Kannianen were involved in the Rehmann murder. Based on Opsahl's incriminating statements and other leads, Opsahl was charged with first- and second-degree murder in violation of Minn.Stat. §§ 609.185(3); 609.05, subd. 1; 609.19(1), (2) (1986).

When Olson first spoke to the police, he called Deputy Larry Wittsack of the Carver County Sheriff's Department. In response to that call, Deputy Wittsack and Detectives Wayne Vinkemeier and Richard Waage arranged a meeting with Olson and

Opsahl at Olson's residence. Opsahl told Vinkemeier that he and an acquaintance, John Kannianen, often got drunk and high on drugs and drove around the Lester Prairie area looking for homes to burglarize. Opsahl related that, during one of these "booze cruises," Opsahl waited in the car while Kannianen went up to a house, was greeted by a middle-aged woman in a red shirt, and went inside. Opsahl heard a "poof" approximately ten minutes later, which he subsequently identified to the officers as a gunshot. According to Opsahl's story, Kannianen came out of the house about twenty minutes later with some coins, which he showed to Opsahl. Irvin Rehmann, the murder victim's husband, confirmed that he stored a can of half-dollar coins underneath the laundry room sink. In a taped statement Opsahl gave to police, Opsahl indicated that Kannianen told him that he had shot a woman in the house.

According to Vinkemeier, Opsahl appeared "very nervous * * * teary eyed [and] * * * somewhat emotional about the conversation." After their initial meeting, Vinkemeier and two other sheriff's officers accompanied Olson and Opsahl on a car ride through rural McLeod County. During that trip, Opsahl focused on the Rehmann residence as they drove by and commented that it "could be the place" where Kannianen allegedly shot Rehmann. Opsahl commented that another farm site also looked familiar. After the drive, Opsahl provided police with similar information in a recorded statement.

Approximately a week later, Vinkemeier and Agent Dennis Sigafoos of the Bureau of Criminal Apprehension (BCA) met with Opsahl and took his fingerprints and palm prints. None of these prints matched any fingerprints or palm prints left at the scene of the crime. On June 16, 1989, Opsahl provided police with another statement and accompanied Vinkemeier to a Hutchinson, Minnesota, hardware store to identify the weapon that Kannianen allegedly used in the murder. Opsahl pointed out a .44 caliber handgun. A .44 caliber gun was used in the shooting.

In 1988, the police informed Opsahl that Kannianen could not have been involved in the Rehmann murder, as he was in New Jersey in October 1986. In a 1990 interview, Opsahl changed the story he told the investigators. Opsahl recanted his previous statements, claiming that neither he nor Kannianen were involved in the murder, and that he and Olson agreed to place the blame for the murder on Kannianen because Olson did not like Kannianen.

At trial, Irvin Rehmann testified that he arrived home at approximately 5:45 p.m. on the afternoon of the murder and found the jamb on the door to the garage "busted" and the door kicked in. Once in the kitchen, he found his wife lying dead on the kitchen floor. Daniel Murphy, an officer who arrived later, found a footprint on the exterior of the door that was kicked in. That footprint bore the impression of a shoe tread design but was never matched to any specific shoe.

The state's case relied on statements made by Opsahl to several acquaintances that implicated him in the murder. Ross Reinitz testified that he heard Olson tell Opsahl that they "could always take care of [Opsahl's neighbor] like [they] took care of that old bitch by Lester Prairie." Allan Kroells provided similar testimony. Laura Roberts testified that Opsahl told her that he had hurt someone during a robbery near Winsted, a small town near Lester Prairie. Marina Allan, Opsahl's former live-in girlfriend, testified that during a fight Opsahl told her to "shut up or I'm going to shoot you like I did that little old lady." Richard Rogowski testified that at a Fourth of July party in 1988, Opsahl

admitted to him that he burglarized a house where someone was shot. Dean Johnson testified that Opsahl told him that he had shot and killed a woman during a burglary. According to Robert Beckman, Opsahl told him that Olson shot a woman in the head with a .44 caliber handgun. Corey Telthoester testified that Olson told him that he and Opsahl burglarized the house and that Opsahl shot an older woman in the house while Olson was on his way out the window of the house. The state presented no physical evidence linking Opsahl to the murder.

Opsahl testified in his own defense but called no other witnesses. He denied that he was involved in the Rehmann murder, that he was at a burglary scene in McLeod County, or that he ever told anyone that he had committed a murder. Opsahl admitted to "booze cruising" with Kannianen around the time of the murder. He testified that Olson, who was familiar with Opsahl's and Kannianen's activities, asked Opsahl if Kannianen could have been involved in the murder. Opsahl testified that he cooperated with the police in order to help them in their investigation by informing them that Kannianen could have committed the crime. He explained that he reacted emotionally during the investigation because the photographs of the deceased victim reminded him of his own grandmother. Opsahl denied making any admissions to Rogowski at a Fourth of July party in 1988, claiming instead that he attended a fireworks display in Minneapolis.

The jury convicted Opsahl of two counts of second-degree murder and one count of first-degree murder. We affirmed the conviction on direct appeal and held, inter alia, that the record contained sufficient evidence to support the conviction. *State v. Opsahl*, 513 N.W.2d 249, 255 (Minn. 1994).

On October 29, 2002, Opsahl filed this petition for postconviction relief in district court in McLeod County. Opsahl claimed that he was entitled to a new trial or, alternatively, an evidentiary hearing, based on recanted trial testimony and prosecutorial misconduct. In addition, Opsahl argued that he was entitled to a new trial or a *Schwartz* hearing based on juror misconduct. Finally, he alleged that he was deprived of his Sixth Amendment right to effective assistance of counsel by his counsel's failure to fully investigate possible exculpatory evidence. The state opposed each claim on the merits and argued that the lapse in time between conviction and Opsahl's petition should bar him from obtaining postconviction relief.

In support of his petition, Opsahl submitted affidavits in which three of the state's witnesses recant their testimony. Rogowski claims that he "made up the entire story" and never even attended a Fourth of July party with Opsahl. Reinitz states that he told the prosecutor that he did not hear the exchange between Opsahl and Olson clearly and that he was unsure of who made the original comment about the murder. Reinitz further states that, at the time of the conversation, he knew of the murder investigation and assumed that the two were joking. Similarly, Roberts states that she used large amounts of illicit drugs around the time of the events to which she testified, which affected her memory. In addition, she states that her knowledge of the Rehmann murder was gleaned from a letter written to her by Kannianen.

Opsahl also submitted the affidavits of individuals who claim to have heard certain state witnesses recant trial testimony. William O'Keefe, a private investigator hired by Opsahl's counsel, describes an interview with Dean Johnson. Although Johnson did not alter the substance of his

testimony, he implied to O'Keefe that he lied on the stand when he testified that he had just opened up his first beer of the night when Opsahl made his incriminating statements. Maury Beaulier, an attorney who represented Opsahl in 1998, states that Marina Allan completely recanted her testimony to him, claiming that she fabricated her testimony out of anger at Opsahl, who had been an abusive boyfriend.

Opsahl's prosecutorial misconduct claims are intertwined with the recantations he presents. According to Opsahl, each of the recanting witnesses provided misleading testimony under pressure from the prosecutor. Reinitz and Rogowski were on probation at the time of the trial and claim that they provided incriminating testimony in response to threats from the prosecutor that he would revoke their probation if they did not testify favorably to the state. In addition, Roberts states in her affidavit that, despite informing the prosecutor of her unreliability, he encouraged her to "testify without qualification" about the conversation she allegedly had with Opsahl. Furthermore, Opsahl claims that the failure of the prosecutor to disclose the substance of these threats violated Opsahl's due process rights under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

The petition before this court is not Opsahl's first attempt to obtain postconviction relief. In May 1996, Opsahl retained counsel to represent him in postconviction proceedings. Despite Opsahl's repeated telephone calls, counsel did no work on his case and the Office of Lawyers Professional Responsibility began investigating the matter. *In re Disciplinary Action Against Pucel*, 588 N.W.2d 741, 742 (Minn. 1999). Opsahl then enlisted the help of other counsel to prepare his petition for postconviction relief. Opsahl's current de-

fense team filed his petition for postconviction relief in October 2002.

The postconviction court reviewed the affidavits submitted by Opsahl and concluded that the recanting witnesses' assertions were "inherently suspect," as the witnesses were all friends and acquaintances of Opsahl. The court also found that there were "numerous other witnesses" who testified to statements Opsahl made, such that the recantations could not have affected the jury's verdict. These conclusions led the court to deny Opsahl's claims for relief that rested on prosecutorial misconduct and recanted testimony. Similarly, the court rejected the ineffective assistance of counsel and juror misconduct arguments and denied Opsahl's petition without an evidentiary hearing.

Opsahl now appeals, claiming that the postconviction court abused its discretion by denying his motion for an evidentiary hearing or a new trial. The postconviction court abused its discretion, Opsahl argues, because the court concluded, without the benefit of an evidentiary hearing, that the recanting witnesses were unreliable and the jury would not have reached a different result without the recanted testimony.

I.

■■■ Opsahl claims that the postconviction court abused its discretion by failing to grant a new trial or evidentiary hearing on his ineffective assistance of counsel claim. Because claims of ineffective assistance of counsel involve mixed questions of law and fact, our review of decisions by the postconviction court is de novo. *State v. Rhodes*, 657 N.W.2d 823, 842 (Minn.2003). The party alleging ineffective assistance must show that " 'representation fell below an objective standard of reasonableness' " and " 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of

the proceeding would have been different.' " *Gates v. State,* 398 N.W.2d 558, 561 (Minn.1987) (quoting *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). That objective standard is defined as "representation by an attorney exercising the customary skills and diligence that a reasonably competent attorney would perform under similar circumstances." *State v. Gassler,* 505 N.W.2d 62, 70 (Minn.1993) (quoting *White v. State,* 309 Minn. 476, 481, 248 N.W.2d 281, 285 (1976)). We have repeatedly stated that we generally will not review attacks on counsel's trial strategy. *See, e.g., Boitnott v. State,* 631 N.W.2d 362, 370 (Minn.2001). The extent of counsel's investigation is considered a part of trial strategy. *See State v. Jones,* 392 N.W.2d 224, 236 (Minn.1986).

■ Our reluctance to scrutinize trial tactics is grounded in the public policy of allowing counsel to "have the flexibility to represent a client to the fullest extent possible." *Id.* For example, in *Jones,* the defendant claimed that his trial counsel was ineffective for, among other things, failing to hire an investigator and interview prospective witnesses. *Id.* We rejected the defendant's claim, reasoning that it attacked the trial strategy rather than the professional performance of counsel. *Id.* We relied on *Jones* in *Scruggs v. State,* in which we rejected a claim that trial counsel was ineffective for failing to call three potential witnesses. *Scruggs v. State,* 484 N.W.2d 21, 26–27 (Minn.1992).

■ Opsahl argues that his trial counsel was ineffective for failing to conduct a thorough investigation into two alternative suspects and the tire tracks that were left at the crime scene. The police investigated those suspects, Mark Winkleman and Kevin Westphal, in the weeks following the murder, but eventually abandoned their investigation. Second, Opsahl argues that his counsel should have presented evidence that Opsahl's car would not likely have created the tire tracks left outside the Rehmann residence. Opsahl now offers evidence that a Camaro such as Opsahl drove would have left distinctive tire tracks, yet Deputy Vinkemeier's report stated that the marks at the scene "showed no definite pattern or characteristics."

Similarly to the defendants in *Jones* and *Scruggs,* Opsahl attacks decisions that reflect on his counsel's strategy rather than his counsel's performance. We are in no position to second-guess counsel's decision to focus his strategy on other defenses instead of investigating Winkleman and Westphal as suspects. Counsel's decision not to pursue the tire track evidence similarly falls within the realm of defense strategy. Because Opsahl only challenges his counsel's defense strategy, we will not challenge the district court's conclusion that counsel provided "most adequate" representation. We therefore hold that the postconviction court did not abuse its discretion by failing to grant a new trial or an evidentiary hearing on Opsahl's ineffective assistance of counsel claim.

## II.

■ We now turn to Opsahl's claim that the postconviction court abused its discretion by denying his juror misconduct claim without granting a *Schwartz* hearing. We review denials of *Schwartz* hearings on an abuse of discretion standard. *State v. Church,* 577 N.W.2d 715, 721 (Minn.1998).

■ In cases in which a petitioner alleges juror misconduct, the trial court may order a hearing with jurors who were privy to the alleged misconduct in the presence of all interested parties. Minn. R.Crim. P. 26.03, subd. 9; *Schwartz v. Minneapolis Suburban Bus Co.,* 258 Minn.

325, 328, 104 N.W.2d 301, 303 (1960). Although a court will not generally consider the affidavits of jurors impeaching the verdict, it may hear testimony that a juror was influenced by "extraneous prejudicial information" in reaching a verdict. Minn. R. Evid. 606(b); *see also* Minn. R.Crim. P. 26.03, subd. 19(6); Minn. R. Evid. 606(b) Advisory Committee's Note. To obtain a *Schwartz* hearing, the petitioner has the burden of adducing "sufficient evidence which, standing alone and unchallenged, would warrant the conclusion of jury misconduct." *Church,* 577 N.W.2d at 720 (quoting *State v. Larson,* 281 N.W.2d 481, 484 (Minn.1979)). The court is never obligated to accept the allegations of the party challenging the verdict, however, and may consider contradictory affidavits from the party opposing the hearing. *See Larson,* 281 N.W.2d at 484.

Opsahl alleges that the jury's decision was tainted when one juror learned of incriminating information that was not in evidence and shared that information with his fellow jurors. Opsahl submits the affidavit of juror Omer Lentsch who states that "to the best of [his] recollection," he learned from the Worm family, the employer of Opsahl and Olson at the time of the murder, that Opsahl left work early the day of the murder and that Olson remained at work all day. Lentsch claims that he relied on this information in voting to convict Opsahl and that "to the best of [his] recollection," he told the other jurors about the conversation. In response, the state submits the affidavit of Gerald Worm, who admits he spoke to Lentsch about the case but contends that the conversation occurred six months to one year after the trial concluded.

The postconviction court concluded that Lentsch's affidavit, taken alone and unchallenged, did not support the conclusion of juror misconduct. Opsahl claims that the postconviction court abused its discretion by discrediting Lentsch's affidavit with that of Gerald Worm. By considering Worm's affidavit, Opsahl argues that the district court violated our holding in *Church* that a court consider a juror affidavit "standing alone and unchallenged."

Opsahl's allegations that the postconviction court abused its discretion are unpersuasive. The court was presented with an affidavit that contradicted the Lentsch affidavit on which Opsahl relies. The court may have relied upon the fact that Lentsch qualified that his statements were "to the best of [his] recollection," whereas Worm's were unqualified. Therefore, the court acted within its discretion when it concluded that Opsahl had not made out a *prima facie* showing of juror misconduct.

### III.

Opsahl claims that the postconviction court abused its discretion by denying his motion for a new trial on his claim that several witnesses for the state gave false testimony. Alternatively, he argues that the court abused its discretion by disposing of his claim without granting an evidentiary hearing. We review postconviction proceedings to determine whether there is sufficient evidence to support the postconviction court's findings. *Ferguson v. State,* 645 N.W.2d 437, 442 (Minn.2002). We will not disturb a postconviction court's ruling absent an abuse of discretion. *Id.*

Minnesota follows the three-prong test set forth in *Larrison v. United States,* 24 F.2d 82, 87–88 (7th Cir.1928),[1] in determining whether to grant a new trial based on witness recantations. *State v. Caldwell,* 322 N.W.2d 574, 584–85 (Minn.1982). In

1. Overruled by *United States v. Mitrione,* 357 F.3d 712, 719 (7th Cir.2004).

order to receive a new trial, the petitioner must establish the following three prongs of *Larrison* by a fair preponderance of the evidence: (1) the court must be reasonably well-satisfied that the testimony in question was false; (2) without that testimony the jury might have reached a different conclusion; and (3) the petitioner was taken by surprise at trial or did not know of the falsity until after trial. *Ferguson,* 645 N.W.2d at 442. We have held that the third prong is not a condition precedent for granting a new trial, but rather a factor a court should consider when deciding whether to grant the petitioner's request. *Id.* at 445.

 The showing required for a petitioner to receive an evidentiary hearing is lower than that required to receive a new trial. *Id.* at 446. Minnesota Statutes § 590.04, subdivision 1 (2002), mandates that the postconviction court hold an evidentiary hearing and make findings of fact and conclusions of law "[u]nless the petition and the files and records of the proceeding conclusively show that the petitioner is entitled to no relief." We have interpreted this section to require the petitioner to allege facts that, if proven, would entitle him to the requested relief. *Ferguson,* 645 N.W.2d at 446. These allegations must be " 'more than argumentative assertions without factual support.' " *Id.* (quoting *Beltowski v. State,* 289 Minn. 215, 217, 183 N.W.2d 563, 564 (1971)). However, a court must grant an evidentiary hearing "whenever material facts are in dispute that * * * must be resolved in order to determine the issues raised on the merits." *Hodgson v. State,* 540 N.W.2d 515, 517 (Minn.1995). If the postconviction court harbors any doubts as to whether to conduct an evidentiary hearing, it should resolve those in favor of granting the hearing. *King v. State,* 649 N.W.2d 149, 156 (Minn.2002). In addressing this standard,

postconviction courts must consider the nature of the evidence presented at trial. *State v. Rhodes,* 627 N.W.2d 74, 88 (Minn. 2001). Therefore, we have noted that evidentiary hearings are particularly appropriate when the petition attacks important evidence in a circumstantial case. *Ferguson,* 645 N.W.2d at 446.

The postconviction court stated that it was not "reasonably well satisfied" that the testimony of the recanting witnesses was false based upon Opsahl's showing. Based on its recollection of the trial, the court concluded that Marina Allan's recantation was not reliable. The court concluded that Reinitz and Roberts had a better recollection of events at trial than at the postconviction stage. With respect to Johnson, the court noted that Johnson did not change the substance of his testimony. The court did not address the affidavit of Rogowski. Based upon these evaluations, the court concluded that it was "dealing with a chorus of liars, with the only question being whether the concert was at trial, or * * * at the motion for a retrial." The court also concluded that the jury would not have reached a different result without the recanted testimony. Based upon its assessment of the credibility of the witnesses and the strength of the state's case, the court denied Opsahl's motion for a new trial without granting an evidentiary hearing.

The allegations in Opsahl's petition and supporting affidavits meet the minimal standard for an evidentiary hearing under Minn.Stat. § 590.04, subd. 1 (2002). Although we are generally reluctant to challenge the basis for a conviction, we are more reluctant to deny a hearing for postconviction relief when our decision turns on the credibility of recanting witnesses. By concluding that the recantations were unreliable without first evaluating the credibility of the witnesses at an evidentia-

ry hearing, the postconviction court misapplied Minn.Stat. § 590.04 and, therefore, abused its discretion.

Turning to the second prong of the *Larrison* inquiry, we believe that the district court abused its discretion by concluding that the jury would not have reached a different result without the recanted testimony. The petition and affidavits challenge the truth or believability of five out of seven witnesses who testified that they heard Opsahl make incriminating statements. These recantations are particularly significant because there was no physical evidence linking Opsahl to the murder. Because Opsahl's petition calls into question such a significant part of the state's circumstantial case, we conclude that the postconviction court abused its discretion by concluding that the jury would have reached the same result without the recanted testimony.

## IV.

■ Opsahl argues that the postconviction court abused its discretion by failing to grant an evidentiary hearing on his claim that the prosecutor threatened to revoke the probation of Reinitz and Rogowski if they did not testify favorably to the state, and coerced Roberts into providing misleading testimony.[2]

■ Threatening to revoke the probation of witnesses if they do not testify a certain way clearly constitutes prosecutorial misconduct. *See* Minn. R. Prof. Conduct 3.8 cmt.; 8.4(c), (d). The remedy for such misconduct is a new trial unless that misconduct was harmless beyond a reasonable doubt. *State v. Hunt*, 615 N.W.2d

294, 301–02 (Minn.2000). For serious instances of prosecutorial misconduct, the prosecutor's conduct "is harmless beyond a reasonable doubt if the verdict rendered was surely unattributable to the error." *Id.* at 302. Even if a court does not grant a new trial, however, it must grant an evidentiary hearing if the petitioner alleges facts that, if proven, entitle the petitioner to relief. Minn.Stat. § 590.04, subd. 1.

The postconviction court dismissed the statements of Rogowski and Reinitz regarding prosecutorial misconduct. The court implied that the statements were unreliable because these witnesses "ha[d] axes to grind" with the prosecutor, who also charged them with drug offenses. The court concluded that Roberts' assertions of prosecutorial coercion were unreliable because she was a friend of Opsahl's and "a reluctant witness."

As with the allegations of falsified testimony, we believe that the allegations of prosecutorial misconduct in Opsahl's petition and supporting affidavits meet the minimal standard for an evidentiary hearing under Minn.Stat. § 590.04, subd. 1. If the allegations of Reinitz, Rogowski, and Roberts are credible, they create a material issue of fact with respect to the circumstances surrounding Opsahl's conviction. These are more than mere "argumentative assertions"; they are sworn statements that allege the prosecuting attorney pressured three witnesses into providing testimony that he knew was false or misleading. After an evidentiary hearing, the postconviction court may conclude that these three witnesses are only coming forward to satisfy their grudge against the

---

2. Opsahl also claims that the prosecutor's conduct violated his due process rights under *Brady*. *Brady* requires the prosecutor to disclose exculpatory evidence to the defense. 373 U.S. at 87, 83 S.Ct. 1194. If Opsahl's allegations are true, however, the prosecutor would have committed misconduct simply by threatening those witnesses with probation revocation. We, therefore, need not address the effect of withholding this information from the defense.

prosecutor. Nevertheless, when a petitioner presents sworn statements that some of the testimony used to convict him was falsified and the product of improper coercion by the prosecution, such allegations satisfy the minimal requirements for a postconviction evidentiary hearing.

### V.

The state argues in the alternative that the lapse in time between Opsahl's conviction and the filing of his petition for postconviction relief should preclude him from receiving relief. The postconviction court did not address this argument.

If a party's deliberate, inexcusable delay in filing a petition for postconviction relief rises to the level of "an abuse of the judicial process," the court may deny relief without reaching the merits of the claim. *McMaster v. State,* 551 N.W.2d 218, 218–19 (Minn.1996). Notwithstanding the diligence of a petitioner, a court may refuse to grant a new trial if the state shows that it would be "unduly prejudiced" by a new trial. *Hoagland v. State,* 518 N.W.2d 531, 536 (Minn.1994). As the state points out, a court should consider the lapse of time between conviction and a petition for postconviction relief when it determines whether or not to grant a retrial. *Kost v. State,* 356 N.W.2d 680, 682–83 (Minn.1984). Although the timeliness of a petition is a factor in deciding whether or not to grant a new trial, it is not dispositive. *See Hoagland,* 518 N.W.2d at 536 (holding that an eight-year delay in filing for postconviction relief did not constitute an abuse of the judicial process). A court should also examine the nature of the issues and the ability of the state to reconstruct its case on retrial. *See id.; Wensman v. State,* 342 N.W.2d 150, 151 (Minn. 1984).

The level of prejudice the state may suffer from a retrial will not be apparent until the state presents evidence to the postconviction court regarding the difficulties it would encounter in a retrial. At that time, the court is to make findings of fact with respect to the specific difficulties that the state may experience in a retrial. The court should then make conclusions of law as to whether those difficulties rise to the level of "undue prejudice." Because the record is not fully developed on this point, we decline to address this issue until the district court has held an evidentiary hearing.

We retain jurisdiction over this case and remand it to the postconviction court with instructions to grant Opsahl an evidentiary hearing under Minn.Stat. § 590.04 on his claims of falsified testimony and prosecutorial misconduct. When the court conducts the evidentiary hearing, it shall make findings of fact and conclusions of law on the issues of recanted testimony and prosecutorial misconduct. If, based on the trial record and the testimony at the evidentiary hearing, the district court determines that Opsahl is entitled to a new trial, it shall address the state's alternative argument that the ten-year lapse in time between Opsahl's conviction and the filing of his petition for postconviction relief should preclude him from receiving relief.

Affirmed in part, reversed in part, and remanded.

GILBERT, Justice (concurring in part, dissenting in part).

While I concur in the majority's discussion of this case in sections I, II, IV & V and its decision that the postconviction court did not abuse its discretion in denying appellant's petition for a new trial, I respectfully dissent as to the majority's decision to remand this case for a further evidentiary hearing based on the alleged recanted testimony of five trial witnesses. Appellant chose to submit his evidence to

the postconviction court in affidavit form—a form of evidence that is provided for by Minn.Stat. § 590.04, subd. 3 (2002)—but the majority nevertheless holds that the postconviction court abused its discretion in failing to grant an evidentiary hearing. Furthermore, the majority errs in concluding that the postconviction court abused its discretion because the allegations, even if true, do not attack the overwhelming amount of inculpatory (non-recanted) evidence supporting the guilty verdict. For these reasons, I would affirm the postconviction court's decision to deny a further evidentiary hearing.

Minnesota Statutes § 590.04, subd. 3 (2002), provides that "[i]n the discretion of the court, it may receive evidence in the form of affidavit, deposition, or oral testimony." Contrary to this clear language, the majority today holds that the postconviction court abused its discretion because it did not "evaluat[e] the credibility of the witnesses at an evidentiary hearing," presumably meaning it erred in not taking oral testimony. This is an unwarranted expansion of the need for an evidentiary hearing that we recognized in *Ferguson v. State,* 645 N.W.2d 437, 446 (Minn.2002). In *Ferguson,* we held that a statement by the father of the primary witness against the defendant that the witness told him he lied at trial entitled the defendant to an evidentiary hearing on his claim. *Id.* We did so because "the state's case against Ferguson was wholly circumstantial" and the witness's testimony "was pivotal to Ferguson's conviction." *Id.* The state's case against appellant, in contrast, was more than circumstantial and not dependent on the testimony of the alleged recanting witnesses.

In affirming appellant's conviction on direct appeal, we held that there was more than sufficient evidence to sustain the conviction including, but not limited to, numerous incriminating statements and admissions against penal interest made by appellant that could have only been known by someone at the crime scene. *State v. Opsahl,* 513 N.W.2d 249, 255 (Minn.1994). Appellant's admissions occurred during four separate statements that he made to the police in 1987, 1988, 1989, and 1990. Appellant identified the .44 caliber weapon that was used in the murder by pointing out a similar weapon at a local hardware store and provided a description of the residence after driving by it with the police. Appellant also knew details about the farm where the murder occurred. After the police confronted appellant about his false alibi with John Kannianen, appellant responded that if Kannianen had done it, then he was not involved. Appellant took the stand and had an opportunity to present his theory of the case, provide rebuttal testimony to what numerous witnesses had testified to, and to explain to the jury why he had initially lied. In appellant's direct appeal, we applied the traditional standard of viewing the evidence presented in the light most favorable to the verdict. *See id.* The alleged recanted testimony in this case was not pivotal to appellant's conviction.

The postconviction court in this case made 39 pages of findings. "We review a postconviction proceeding to determine if there is sufficient evidence to sustain the postconviction court's findings, and we will not disturb the court's decision absent an abuse of discretion." *State v. Rhodes,* 627 N.W.2d 74, 86 (Minn.2001). Furthermore, determining the credibility of witnesses is best left to the district court. The postconviction court judge who made these findings was also the original trial judge.[1] The postconviction court pointed out that

---

1. Unfortunately, the distinguished trial judge, the Honorable L.W. Yost, died on December

the alleged recanting witnesses were all appellant's personal friends and may have felt remorse after appellant had served over 10 years in jail. The manner and quality of the "recanted" testimony was taken into consideration by the postconviction court through sworn affidavits, as was the effect of cross-examination by defense counsel during the initial trial of these same witnesses. Contrary to what the majority holds, the postconviction court did evaluate the credibility of the witnesses. The court found their recantations to be "inherently suspect" and further found that appellant "has not shown by a fair preponderance of the evidence that material facts are in dispute."

Because this court has decided to remand this matter for a further evidentiary hearing, and the matter may well appear before us again, I do not deem it necessary or prudent to detail my views on each of the witness's recantations. Suffice it to say, I would affirm the postconviction court's finding that these recantations were "inherently suspect" based on the record before us. I agree with the postconviction court, which aptly stated:

> In the final analysis and upon review of the affidavits of the recanting witnesses, one can speculate that we are dealing with a chorus of liars, with the only question being whether the concert was at the trial, or is it now, at the motion for a retrial. If it was at the trial, then they are perjurers all and if it is now, then they have the unique ability to have their memory sharpen with the passage of time.

I also agree with the postconviction court's findings and conclusion that whether these witnesses were lying in 1992 at the time of trial or now, the jury would not have reached a different result without the recanted testimony. The postconviction court did not harbor any doubts as to whether to conduct an evidentiary hearing. *See King v. State,* 649 N.W.2d 149, 156 (Minn.2002). Furthermore, although there was no physical evidence linking appellant to the murder, there was significant inculpatory evidence linking appellant to the murder, including statements against his penal interest that he made on numerous occasions. I would affirm the postconviction court's finding based on the record before it that any error caused by the testimony of these witnesses was harmless.[2]

Finally, because this court has decided to remand the case for a further evidentiary hearing, the postconviction court will have to consider the potential prejudice that would face the state if the postconviction court were to order a new trial. In section V, the majority appropriately discusses some of the factors that the postconviction court should take into consideration on remand. The murder took place 17 years ago and the trial took place 11 years ago. Two material witnesses who testified at trial have since died and two others apparently cannot be located. Prejudice to the state may be a legitimate problem in this case should the postconviction court determine on remand that a new trial would otherwise be warranted.

---

31, 2003. His untimely death further complicates a remand because he had the opportunity to judge the credibility of the witnesses at the trial in 1992.

**2.** Two of the affidavits submitted alleging recanted testimony are affidavits of attorneys currently representing appellant on appeal. It should be a rare circumstance in which an attorney decides to make himself or herself a material witness in a case he or she is arguing on appeal.