STATE of Minnesota, Respondent,

v.

Jermaine FERGUSON, Appellant.

Nos. A06–498, A07–1125.

Supreme Court of Minnesota.

Dec. 27, 2007.

Charles Frederick Clippert, Special Assistant State Public Defender, Bethel & Associates, Mounds View, MN, for Appellant Jermaine Ferguson.

Lori Swanson, Minnesota Attorney General, St. Paul MN, Michael O. Freeman, Linda K. Jenny, Hennepin County Attorney, Minneapolis, MN, for Respondent.

## OPINION

ANDERSON, RUSSELL A., Chief Justice.

Appellant Jermaine Ferguson was convicted in Hennepin County District Court of first-degree murder, in violation of Minn.Stat. §§ 609.185(a)(1), 609.05 (2006), and attempted first-degree murder, in violation of Minn.Stat. §§ 609.185(a)(1), 609.17, subd. 1, 609.05 (2006), in the December 7, 2004, shooting death of Joseph Papasodora and injuries to Gordon Hill and Ernest Houle. In this consolidated appeal, Ferguson argues that (1) the dis-

trict court erred in limiting cross-examination of a key prosecution witness; (2) the evidence was insufficient to support the convictions; and (3) an evidentiary hearing was required on his postconviction claim of recanted testimony. We affirm.

Collin Goodwin shared an apartment at 2529 12th Avenue South in Minneapolis with his 18–month old son, the child's mother, and Gordon Hill. On December 7, 2004, around 9:00 a.m., Goodwin drove to New Brighton to pick up Ernest Houle. They returned to the 12th Avenue fourplex, where they met Joseph Papasodora. Goodwin drove with Houle and Papasodora to 3416 5th Avenue South, where Goodwin shared a bedroom with the mother of his other young children and where the children's grandmother and other family members also resided. Goodwin wanted to get some marijuana. On entering his bedroom, he found Andre Miller in his bed. Enraged, Goodwin "started beating him up." Miller, bleeding, "ran for cover" in another bedroom. Upon leaving the house, Goodwin exchanged threats with Johntaye Hudson, a family friend. Goodwin returned to his car and told Papasodora and Houle what he had done to "this mother f* * *er" he "just caught in [his] bed."

Goodwin, Houle, and Papasodora returned to 2529 12th Avenue South, where Hill was looking after Goodwin's child while the child's mother was at the store. Goodwin told Hill about the assault at the 5th Avenue house, visited briefly, and then left to run an errand in Shakopee. Papasodora, Hill, and Houle watched television while Goodwin's child played on the floor by the Christmas tree. They heard footsteps on the stairs. Papasodora, thinking it was the child's mother, rose to open the door. As he did so, the door was kicked open, ripping the molding from the wall. A hail of gunshots followed. Four bullets

penetrated Papasodora, killing him. One bullet penetrated Hill's leg, and he escaped, bleeding, down the back stairs to the basement. Another bullet grazed Houle's chest as he dove for the floor, grabbed Goodwin's child, and ran into a bedroom. When the shooting stopped, he left to take the child to a safe place.

Police officers were in the area within 30 seconds of the first shots-fired call. A bystander who had heard the gunshots directed responding officers to 2529 12th Avenue, the residence from which he had just seen three men running. He said one of the men was wearing a light blue quilted jacket. On entering the dwelling, the officers detected a strong odor of gunpowder. The officers secured the area and waited for homicide investigators to process the crime scene. Hill was taken by ambulance to the Hennepin County Medical Center where, in a brief interview with the police, he indicated that the shooting might be related to the 5th Avenue assault.

Meanwhile, other responding officers were directed to a roofing estimator parked on 11th Avenue. He had been doing paperwork in his truck when he saw three men running through some yards from the direction of 12th Avenue. They had a panicked, "get out of there" look, jumped a fence, "converged" in front his truck, and got into a blue four-door sedan that had just pulled up in front of him. As the blue sedan was leaving, the witness wrote down the license plate number. He gave the license plate number to the officers and told them that one of the men was wearing a light blue jacket.

The police traced the license plate number to a Pontiac Grand Prix registered to Judonna Parker and to her address at 3641 Clinton Avenue South. Shortly after setting up a perimeter around that location, police saw the vehicle leaving through the alley, stopped it, and took the driver, Parker, into custody. The police subsequently arrested Andre Miller and then Parker's fiancé Kentrell Green as each separately left the Clinton Avenue residence through the back door. During the execution of a search warrant on Parker's vehicle, officers found a light blue quilted jacket.

Police officers interviewed Miller, advised him of his *Miranda* rights, and implied that he had some explaining to do. Miller indicated that Parker had driven Hudson, Green, and Ferguson away from the 5th Avenue house after the beating and that Green later told him that someone may have been killed. Police subsequently interviewed Green, who, after telling several stories, reluctantly implicated Hudson and Ferguson in the shooting.

The police also interviewed Parker, who claimed to have no knowledge of what happened on 12th Avenue, telling them that she had been home all day. She was charged with aiding an offender, accomplice after the fact.[1] She was held in jail for 45 days, until she retained an attorney who negotiated a plea agreement. Under the agreement, Parker was to plead guilty to the charged offense in exchange for the State's promise not to oppose a probationary sentence and not indict her for murder, conditioned on truthful testimony at the grand jury proceedings and trials of all codefendants. Parker provided a police statement on January 18, 2005, also implicating Green, Hudson, and Ferguson, and was released on January 21.

During the investigation of the shooting, discharged cartridge casings and fired bullets collected from the crime scene were analyzed by a firearm and tool mark examiner. In processing the crime scene, investigators had collected eight casings:

---

1. *See* Minn.Stat. § 609.495, subd. 3 (2006).

seven outside the front door and one just inside the door. Seven casings were 10–millimeter, had been ejected from the same gun, and were consistent with a Glock manufacture. One casing and one fired bullet were 9–millimeter, and three fired bullets were .40 caliber. Investigators never found the guns used in the shooting.

In February 2005, Ferguson, Green, and Hudson were indicted by grand jury for first- and second-degree murder in connection with the death of Papasodora and attempted first- and second-degree murder in connection with victims Hill and Houle. Months later, acting on a tip, police officers located and arrested Hudson.[2] On May 26, 2005, in response to a "suspicious person" call, officers were dispatched to a dwelling in Minneapolis, confirmed that Ferguson was there, and eventually found him in a bedroom crawlspace.

At Ferguson's trial, Parker testified pursuant to her plea agreement. She stated that on the morning of December 7, 2004, she was at home with Green and their 3–year–old son when Green got a call from Ferguson. She said that Ferguson was Green's closest friend. After the call, Green, who had no driver's license, had her drive him to the 5th Avenue house. On the way, they dropped their son off with a babysitter. At the 5th Avenue house, Parker remained in the car as Green, Hudson, and Miller stood outside talking. Then Green got into the front passenger seat of the car while Hudson and Ferguson got into the back seat. Ferguson was wearing a light blue jacket. Hudson directed her to the 12th Avenue house. There was little conversation;

Parker asked no questions and Green let her know this was none of her business. Hudson told Parker to stop near 2529. The men got out and ran inside. Parker then drove down the street and was making a U-turn when she saw the men running toward 11th Avenue. She drove over to 11th and picked them up. They were breathing hard. They did not talk about what had happened, and she did not ask, but she gave Green a "look" indicating that she was extremely angry. She was tired of his involvement in "everybody else's messes" and did not like "not knowing what was going on in the middle of the day."

Green told Parker to go back to the 5th Avenue house to get Miller. As they were driving back, Ferguson got out near 35th and 5th, leaving his jacket in the car. Hudson got out a block later. After picking up Miller, Parker dropped the men off at the Clinton Avenue home, picked up her son from the babysitter, and returned home. Parker thought she should get some aspirin for Miller, and Green told her to get some beer. As she was going to the store, she was stopped by the police and taken into custody.

Green also testified at Ferguson's trial pursuant to a plea agreement. Before the trial, he had pleaded guilty to second-degree murder and attempted second-degree murder. As part of the agreement, he was obligated to testify at the codefendants' trials. He anticipated a sentence of 30–1/2 to 35 years.

Green testified that he learned of the assault on Miller by phone call from Hudson or Ferguson. He said that "every-

---

**2.** Johntaye Hudson pleaded guilty to second-degree murder and attempted first-degree murder pursuant to a plea agreement. Prior to sentencing, he moved to withdraw the plea. The district court denied the motion and imposed a 299–month sentence for the second-degree murder and a consecutive 180–month term for the attempt. The court of appeals affirmed. *State v. Hudson*, No. A06–151, 2007 WL 330043 (Minn.App.), *rev. denied* (Minn. Apr. 17, 2007). As indicated, we denied further review.

body" thought the assault was wrong, and they decided to confront the person who did it. Green, Hudson, and Ferguson all had guns. Green had a 9–millimeter, Ferguson had a Glock, and Hudson had a "big old stupid" gun. At the 12th Avenue four-plex, Hudson led the way to the second-floor landing, followed by Ferguson and then Green. Ferguson kicked in the door and all three began shooting. Green's gun jammed "probably" after the first shot. They ran out of the house, saw Parker's car down the street, and continued running west, through yards and over a fence, to 11th Avenue where they stood for "a couple of seconds" until Parker drove up. Green said he gave his gun to Hudson before they parted company. He admitted that he initially lied to the police because he did not want to involve Parker and Ferguson. Parker was "his life." Ferguson was "[his] guy." It was not easy for him to "give up" Ferguson and Hudson, and he did not implicate Parker until his guilty plea hearing.

Other evidence presented by the State included cell phone records showing that on December 7, 2004, Green received a call from Hudson's cell phone at 10:23 a.m. There was testimony that Ferguson, Hudson, and Green were at the 5th Avenue house after Miller's assault and left in Parker's Grand Prix; that the first shots-fired call came in at 10:40 a.m.; that Parker's Grand Prix picked up three men on 11th Avenue after the shooting; and that the vehicle was taken into police custody at 10:56 a.m. A carpet layer working across the street from the 12th Avenue fourplex testified that he saw three men get out of a Grand Prix and go inside. After hearing gunshots, he saw the same three men come out of the house and run west, past the house where he was working. The roofing estimator who recorded the Grand Prix's license plate number testified about what he had seen and identified the car in a photo. The State also presented the physical evidence and forensic analysis of the evidence collected during the investigation, including the discharged cartridge casings and fired bullets showing that three guns were involved: a 9–millimeter, a Glock, and a .40 caliber.

The jury returned a verdict of guilt for first-degree murder and two verdicts of guilt for attempted first-degree murder. At sentencing, the court imposed the mandatory life sentence for the first-degree murder conviction and consecutive 120–month terms for the two attempted murder convictions. Ferguson filed a direct appeal but subsequently moved for a stay and remand for postconviction proceedings, which we granted. The district court denied Ferguson's postconviction petition, he appealed, and the direct appeal and postconviction appeal were consolidated.

I.

■ Ferguson first argues that the limitation on cross-examination of cooperating witness Parker regarding the penalty for first-degree murder violated his Sixth Amendment right of confrontation.

■ The Confrontation Clause guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with witnesses against him." U.S. Const. amend VI. "[A] primary interest secured by it is the right of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (internal quotation marks omitted). Effective cross-examination is essential to a fair trial because "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Id.* at 316, 94 S.Ct. 1105. An important function of cross-examination is the exposure of the witness's biases or motivation for testifying. *Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). Viola-

tions of the Confrontation Clause are subject to harmless error analysis. *Id.* at 684, 106 S.Ct. 1431. ("The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt.").

On direct examination, Parker testified about her understanding of the plea agreement. She said that before agreeing to cooperate with the police, she was charged with "[a]iding an offender, a felony," which "is supposed to mean I get half his time and I think the max, say, 15 years." She spent 45 days in jail before deciding, after her daughter's prompting, to "tell the truth." She testified that she agreed to plead guilty to aiding an offender and to provide a truthful statement, and the State agreed not to oppose a probationary sentence and not to indict her for murder. The court read the plea agreement into the record.

On cross-examination, defense counsel also inquired about Parker's understanding of the agreement, including that she was currently out of jail and that she understood that if she testified and cooperated with the State, she would not be charged with murder and would not go to prison. When defense counsel sought to inquire about her perceived exposure to criminal liability and penalties for first-degree murder, the court disallowed the inquiry as it related to Parker. Defense counsel was nevertheless permitted to cross-examine Parker about her awareness that the benefit of her plea agreement was that she would "go from serving a lengthy prison sentence to essentially just getting 45 days." When defense counsel raised that point again later, Parker restated her understanding of the plea agreement: that she had never been charged with murder, that she had been charged with aiding an offender "from the beginning," and that

she "was still charged" with that crime, "so the lengthy prison time" defense counsel was "talking about" was a "sentence of up to 15 years." Later, when cross-examining the homicide investigator on a different matter, defense counsel elicited that the penalty for aiding an offender, accomplice after the fact, in a first-degree murder was half of the 30–year minimum penalty for the murder.

■ The Confrontation Clause is not violated by limitations on cross-examination so long as the jury is presented with sufficient information from which to appropriately draw inferences as to the witness's reliability. *E.g., State v. Dobbins,* 725 N.W.2d 492, 505–06 (Minn.2006) (holding that limitation on cross-examination of cooperating witness regarding the exact penalty the witness otherwise would have received was not a Confrontation Clause violation where defendant was allowed to cross-examine on other aspects of the plea agreement); *State v. DeVerney,* 592 N.W.2d 837, 845 (Minn.1999) (holding that limitation on cross-examination of accomplice as to specific penalty reduction in exchange for accomplice's testimony was not a Confrontation Clause violation where defendant was not prohibited from cross-examining on every other aspect of the plea agreement).

In some circumstances, it may be error to circumscribe a defendant's right to cross-examine a witness about potential sentences for the purpose of exposing potential bias and motive. *See United States v. Turner,* 198 F.3d 425, 430 (4th Cir.1999) (finding evidentiary error in limiting on relevancy grounds cross-examination as to potential penalties but holding that the error was not of constitutional magnitude); *State v. White,* 300 N.W.2d 176, 178 (Minn. 1980) (finding no constitutional error but noting that "we believe that the defendant's interest in fully cross-examining the witness outweighed the state's interest in

not letting the jury indirectly learn the maximum prison term to which defendant would be subjected if convicted"). Nonetheless, one federal court specifically declined to hold that there is a categorical right to such cross-examination where "all of the details of the plea bargain, as the witness understands them, have been disclosed." *United States v. Mussare*, 405 F.3d 161, 170 (3d Cir.2005). Here, in view of defense counsel's substantial and thorough inquiry into the details of Parker's plea agreement and her understanding of the potential penalties absent her cooperation, we conclude that error in the limitation on cross-examination, if any, was harmless.

## II.

■■■ Ferguson next argues that there was insufficient evidence to support the guilty verdicts because they were based on uncorroborated accomplice testimony. He argues that Parker and Green were both accomplices and that their testimony was the only evidence implicating him in the shooting. To assess the sufficiency of the evidence, "we make a painstaking review of the record to determine whether the evidence and reasonable inferences drawn therefrom, viewed in a light most favorable to the verdict, were sufficient to allow the jury to reach its verdict." *State v. Brown*, 732 N.W.2d 625, 628 (Minn.2007). A guilty verdict, however, cannot be based upon the uncorroborated testimony of an accomplice. Minn.Stat. § 634.04 (2006).[3] To be adequate, "corroborating evidence must link or connect the defendant to the crime and must point to the defendant's guilt in some substantial degree." *Turnage v. State*, 708 N.W.2d 535, 543 (Minn.2006) (internal quotation

marks omitted). " 'Circumstantial evidence indicating the defendant's participation in the crime is sufficient to corroborate the accomplice's testimony.' " *State v. Reed*, 737 N.W.2d 572, 584 (Minn.2007) (quoting *State v. Bowles*, 530 N.W.2d 521, 532 (Minn.1995)).

Even assuming that both Parker and Green were accomplices, corroboration was adequate. There was evidence that at 10:23 a.m., Green was called to the 5th Avenue house on a cell phone connected to Hudson. There was Miller's testimony that Green arrived at the 5th Avenue house in Parker's Grand Prix, that "[e]verybody was pissed" about the assault on Miller, and that Ferguson got into that car with Parker, Green, and Hudson. There was bystander testimony that three men ran into the 12th Avenue fourplex, that gunfire erupted, that the same three men ran out and were picked up on 11th Avenue in a Grand Prix, and that one of the men was wearing a light blue quilted jacket. There was testimony that the shots-fired call came in at 10:40 a.m., that the police traced the license plate number of the Grand Prix to Parker and Greens address, that the police impounded the Grand Prix at 10:56 a.m., and that a light blue quilted jacket was in the car. In addition, there was forensic evidence related to the number and make of the guns used and the location of discharged cartridge casings and fired bullets. This forensic evidence corroborates Greens testimony about the guns used, that all three were fired into the apartment from the second floor landing, and that Greens gun jammed after the first shot. In short, physical evidence and non-accomplice testimony connected Ferguson to the shooting and pointed to his guilt in a substantial

3. Minnesota Statutes § 634.04 provides that [a] conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

way. We therefore hold that there was sufficient evidence to support the jury's verdicts of guilt.

## III.

 Finally, Ferguson contends that the district court erred in denying his petition for postconviction relief without an evidentiary hearing. After Ferguson filed his direct appeal, he sought a stay so that he could initiate postconviction proceedings. We granted the stay and remanded the matter to the district court. In his postconviction petition, Ferguson alleged that Green had recanted his trial testimony, offering as evidence the following memorandum from defense investigator Michael Grostyan to Ferguson's trial counsel:

> It should be noted that on May 2, 2006, at 1:00 p.m., [Ferguson's trial counsel] and Michael Grostyan interviewed Kentrell Green, at Stillwater State Prison.
>
> Mr. Green informed us that our client, Jermaine Ferguson, was not present at the scene of the murder that he is serving time for. He indicated that he told the authorities and I believed [sic] he testified also that Jermaine Ferguson was present. His explanation for doing that was that the police threatened to take the children away from the children's mother, Judonna Parker, and they also threatened to send Ms. Parker to prison for her potential involvement.

The district court denied Ferguson's petition without a hearing. Ferguson appealed, the stay of the direct appeal was vacated, and the two appeals were consolidated.

 On review of postconviction decisions, we extend a broad review of both questions of law and fact. *Butala v. State,* 664 N.W.2d 333, 338 (Minn.2003) (internal quotation marks omitted). We review legal issues de novo. *Id.* Our review of factual matters, however, is limited to whether there is sufficient evidence in the record to sustain the postconviction courts findings. *Id.* A petitioner seeking postconviction relief has the burden of establishing, by a fair preponderance of the evidence, facts that would warrant relief. *Ferguson v. State,* 645 N.W.2d 437, 442 (Minn.2002).

 A petitioner is entitled to an evidentiary hearing [u]nless the petition and the files and records of the proceeding conclusively show that the petitioner is entitled to no relief. Minn.Stat. 590.04, subd. 1 (2006). The showing required for a petitioner to receive an evidentiary hearing is lower than that required to receive a new trial. *Opsahl v. State,* 677 N.W.2d 414, 423 (Minn.2004). Any doubts about holding a hearing should be resolved in favor of the party requesting the hearing. *State v. Turnage,* 729 N.W.2d 593, 598 (Minn.2007).

 Witness recantation merits postconviction relief if it satisfies the *Larrison* test, which asks (1) whether the district court is reasonably well-satisfied that the trial testimony given by a material witness was false; (2) whether without the false testimony, the jury might have reached a different conclusion; and (3) whether the petitioner was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial. *State v. Caldwell,* 322 N.W.2d 574, 585 (Minn.1982) (quoting *Larrison v. United States,* 24 F.2d 82, 87–88 (7th Cir.1928)).

Courts generally view recanting affidavits and testimony with suspicion. *Caldwell,* 322 N.W.2d at 585 n. 7.[4] Federal

---

4. Other state courts similarly view recantations with suspicion. *See, e.g., Davis v. State,* 117 P.3d 454, 471 (Wyo.2005) (noting the inherent suspicion surrounding recanted testimony); *Greywind v. State,* 689 N.W.2d 390,

courts view them with extreme suspicion. 26 James Wm. Moore et al., *Moores Federal Practice* 633.05[5][a] (3d ed.2007). In federal courts, [a] motion based on a recantation ordinarily is decided without a hearing. *Id.* 633.05[5][b]; *see also* 3 Charles Alan Wright et al., *Federal Practice and Procedure* 557.1, at 579–80 (3d ed.2004) (explaining the basis for this judicial skepticism).

In Minnesota, when a witness offers the withdrawal of incriminating trial testimony, evidentiary hearings are necessary for purposes of evaluating the reliability of the recantation, but to justify the expense and risk of transporting the petitioner to an evidentiary hearing, it seems to us that the petitioner has an obligation to make a greater showing of a genuine recantation than was made here. *See, e.g., Wilson v. State,* 726 N.W.2d 103, 104–05, 107–08 (Minn.2007) (granting hearing where jailhouse informant recanted in writing); *Opsahl,* 677 N.W.2d at 423–24 (granting hearing based on recanting affidavits). *But see Ferguson,* 645 N.W.2d at 446 (granting hearing based on notarized statement of a witness's father that the witness had confessed that he testified falsely). We agree with the district courts conclusion that the Grostyan memorandum carries insufficient indicia of the trustworthiness of the recantation to merit a hearing. Accordingly, we affirm the summary denial of Ferguson's petition but without prejudice. Ferguson may file a new petition to address this issue based on a more satisfactory showing of a genuine recantation of trial testimony.

Affirmed.

396 (N.D.2004) (Courts look upon recantation with suspicion and disfavor.); *In re Roberts,*

29 Cal.4th 726, 128 Cal.Rptr.2d 762, 60 P.3d 165, 174 (2003).