**Juvon De WILSON, Appellant,**

v.

**STATE of Minnesota, Respondent.**

**No. A05–677.**

Supreme Court of Minnesota.

Jan. 18, 2007.

John Stuart, Minnesota State Public Defender, Michael C. Davis, Special Assistant State Public Defender, St. Paul, MN, for Appellant.

Juvon De Wilson, Stillwater, MN, pro se.

Lori Swanson, State Attorney General, St. Paul, MN, Michael O. Freeman, Hennepin County Attorney, Michael Richardson, Assistant County Attorney, Minneapolis, MN, for Respondent.

OPINION

ANDERSON, PAUL H., Justice.

A Hennepin County jury found Juvon De Wilson guilty of second-degree intentional murder for the death of Dante Jemison. After discovering evidence of inaccurate or possibly false testimony and other new evidence, Wilson petitioned for postconviction relief in the form of a new trial or an evidentiary hearing. The postconviction court denied Wilson's petition without granting a hearing. The Minnesota Court of Appeals affirmed. We reverse and remand to the postconviction court for an evidentiary hearing.

Appellant Juvon De Wilson was arrested and tried in connection with the shooting death of Dante Jemison. No eyewitness to the shooting testified at Wilson's trial, but three witnesses testified to the events leading up to the shooting, saying that they saw Jemison with a man who was holding a gun. One witness testified that, after several attempts at reviewing photo lineups, he identified Wilson as the man with the gun. The same witness also identified Wilson at trial as the man he saw with the gun. Another witness testified that she knew the man with the gun and had known him for about eight years. She also testified that this man was known as "E" and that "E" was holding a bottle just before the shooting. She identified Wilson in a photo lineup, but at trial she did not identify Wilson as the man with the gun.[1] The last witness to the events before the shooting could not identify the man holding the gun.

Anthony Wallace, a jailhouse informant, also testified at trial. Wallace testified that Wilson told Wallace that he had killed

---

1. The witness testified that she identified "E" in the photo lineup, but the police officer who conducted the lineup testified that the witness identified Wilson only as someone she recognized.

Jemison. Wallace's trial testimony was consistent with a statement he had given to the police. But before trial, Wallace recanted that statement, stating in writing that he had learned the facts of the case by reading Wilson's file and that Wilson had not confessed to him. At trial, Wallace reverted to his initial statement, testifying that Wilson wrote most of the recantation and that Wallace did not read it, even though Wallace wrote the first line and a half. In exchange for his testimony, Wallace received a stayed sentence and probation for several prior convictions and pending charges.

A forensic scientist who is an officer with the Minneapolis Police Department testified that he used a microscope and a cautery probe to analyze a jacket worn by Wilson. The officer explained that he used the cautery probe to determine whether specks visible on the jacket when using a microscope were gunpowder. The cautery probe caused the specks to vaporize, destroying them. The officer testified that he was not aware of anything other than gunpowder that would react that way to such a test and said that he was 99.9 percent sure that the specks were gunpowder. Apparently, the officer did not photograph the specks or document their size, shape, or color. Wilson did not learn of the results from the officer's test or that the officer would testify until the day of jury selection, but Wilson did not request a continuance to retain his own expert, nor did he call an expert to rebut the officer's testimony.

The jury found Wilson guilty of second-degree intentional murder. Approximately one month later, Daniel Mack contacted Wilson's defense counsel to inform counsel that he had witnessed the Jemison shooting and that Wilson was not the shooter. Mack also identified two different men known by the nickname "E," neither of whom, according to Mack, is Wilson. Mack stated that he had not been interviewed by the police about what he saw the night of the shooting. The record reflects that at the time of trial, there was a warrant out for Mack's arrest and that the police were unable to locate him. Mack also directed defense counsel to two other eyewitnesses to the Jemison shooting, Patrick Slaughter and Eric Owens. Slaughter and Owens also told defense counsel that Wilson was not the shooter.[2]

Based on the newly-discovered eyewitness evidence, Wilson moved for a new trial and petitioned for postconviction relief. The district court denied the motion for a new trial as untimely. Wilson then timely filed a direct appeal, but sought a stay of the appeal and a remand to the district court for postconviction proceedings. The court of appeals dismissed Wilson's direct appeal and remanded for postconviction proceedings.

After the remand, Wilson's counsel retained an expert to examine a fingerprint on a bottle that the police found at the shooting scene. The expert ascertained that the fingerprint did not match Wilson's fingerprints.[3] The defense also retained a forensic scientist, Richard Ernest, who called into question the forensic testimony

2. The parties disagree about whether the three new witnesses were listed in the police reports. The postconviction court found that they were listed, but one defense attorney swears by affidavit that none of the three was listed "as [a] witness[] to the murder" and that Eric Owens' last name was "never mentioned at all."

3. Before trial, the state had tested the fingerprint on the bottle against Jemison's fingerprints and found that they did not match. There is nothing in the record to indicate whether the police checked the fingerprint against those of Wilson. The defense did not test the fingerprint at the time of trial.

of the Minneapolis police officer. Ernest stated in an affidavit that (1) no FBI protocols involve using a cautery probe to test for the presence of gunpowder and modern crime labs do not commonly use that test; (2) forensic scientists avoid tests that destroy evidence; (3) forensic scientists examine particles for their size, shape, and color, and photograph them; and (4) the particles that the officer described could have been any number of things other than gunpowder. In the meantime, Wallace recanted his trial testimony, again claiming that Wilson had not confessed to him and that he had learned of the details of Wilson's case by reading the file.

Wilson amended his petition for postconviction relief in order to accommodate the foregoing evidence. The amended petition contained a request for either a new trial or an evidentiary hearing. Without granting a hearing, the postconviction court denied Wilson's amended petition for postconviction relief. The court of appeals, in an unpublished opinion, affirmed the postconviction court. *Wilson v. State*, No. A05–677, 2006 WL 997738, at *5 (Minn. App. Apr. 18, 2006). Wilson then filed a petition for review with our court, which we granted.

■ Wilson argues that he is entitled to a new trial based on evidence of false testimony and newly-discovered evidence. He also argues that, at a minimum, he is entitled to a postconviction evidentiary hearing concerning the evidence of false testimony and newly-discovered evidence. We first address whether Wilson has provided sufficient evidence to entitle him to a new trial.

■ We review decisions of a postconviction court for an abuse of discretion. *Opsahl v. State (Opsahl II )*, 677 N.W.2d 414, 422 (Minn.2004). A petitioner has the burden of establishing, by a preponderance of the evidence, facts that would warrant relief. *Ferguson v. State*, 645 N.W.2d 437, 442 (Minn.2002). We apply a three-prong test, known as the *Larrison* test, to claims of newly-discovered evidence of falsified testimony. *Sutherlin v. State*, 574 N.W.2d 428, 433 (Minn.1998); *State v. Caldwell*, 322 N.W.2d 574, 584–85 (Minn.1982) (adopting by implication the *Larrison* test in Minnesota). This test provides that three things must be true before a new trial will be granted: (1) the court must be reasonably well-satisfied that the trial testimony was false; (2) without the false testimony, the jury might have reached a different conclusion; and (3) the petitioner was taken by surprise at trial or did not know of the falsity until after trial. *Ferguson*, 645 N.W.2d at 442.

■ We have distinguished the *Larrison* test from the four-prong *Rainer* test for newly-discovered evidence. *See Dukes v. State*, 621 N.W.2d 246, 257–58 (Minn. 2001). To receive a new trial under the *Rainer* test, the petitioner must prove that: (1) the evidence was not known to the petitioner or counsel at the time of trial; (2) the evidence could not have been discovered through due diligence before trial; (3) the evidence is not cumulative, impeaching, or doubtful; and (4) the evidence probably would produce an acquittal or a more favorable result. *Sutherlin*, 574 N.W.2d at 434; *Rainer v. State*, 566 N.W.2d 692, 695 (Minn.1997).

. We conclude that Wilson's petition for postconviction relief did not meet the standards required by the *Larrison* test for newly-discovered evidence of false testimony or the *Rainer* test for newly-discovered evidence, generally. Accordingly, we conclude that Wilson is not entitled to a new trial. But we acknowledge that our conclusion could result in part from Wilson's inability to present evidence at a hearing before the postconviction court. There-

fore, we next address the question of whether Wilson alleged sufficient facts to warrant an evidentiary hearing.

 A petitioner's burden of proof for a postconviction evidentiary hearing is lower than his burden for a new trial. *Opsahl II*, 677 N.W.2d at 423 (citing *Ferguson*, 645 N.W.2d at 446). Minnesota Statutes § 590.04, subd. 1 (2004), mandates that the postconviction court hold an evidentiary hearing and make findings of fact and conclusions of law "[u]nless the petition and the files and records of the proceedings conclusively show that the petitioner is entitled to no relief." We have interpreted the statute "to require the petitioner to allege facts that, if proven, would entitle him to the requested relief." *Opsahl II*, 677 N.W.2d at 423 (citing *Ferguson*, 645 N.W.2d at 446). The allegations must have factual support and the postconviction court must grant the evidentiary hearing whenever material facts are in dispute. *Id.* at 423 (citations omitted). We have stated that if the court has any doubts about whether to conduct a postconviction hearing, the doubts should be resolved in favor of granting the hearing. *Id.* (citing *King v. State*, 649 N.W.2d 149, 156 (Minn.2002)). Finally, we have stated that a postconviction hearing is particularly important when the petition "attacks" important evidence in a circumstantial case. *Id.* (citing *Ferguson*, 645 N.W.2d at 446).

The postconviction court determined that Wallace's recantation was untrustworthy, and stated that it was not reasonably well-satisfied that Wallace's trial testimony was false. We have stated that a new trial based on witness recantations is disfavored. *Opsahl v. State (Opsahl III)*, 710 N.W.2d 776, 782 (Minn.2006). But we have also cautioned postconviction courts not to determine that a recantation is unreliable without first taking the opportunity to evaluate the credibility of the witness at an evidentiary hearing. *See Opsahl II*, 677 N.W.2d at 423–24. In this case, an evidentiary hearing is appropriate because it is difficult if not impossible to test Wallace's conflicting statements without examining Wallace under oath. Without such examination, the postconviction court cannot make a judgment about which story is true and which is false.

We also conclude that the existence of three newly-discovered witnesses emphasizes the need for a credibility determination at a postconviction hearing. The three new witnesses have similar accounts of what happened the night of the shooting. They each swear that they witnessed the shooting and that Wilson was not the shooter. The postconviction court expressed concern about the veracity of Mack's statements and the lack of detail in the accounts of Slaughter and Owens. But a postconviction hearing is exactly the forum in which the court can examine and compare each witness's account for truthfulness and elicit details about each witness's knowledge. A postconviction hearing would also give the court an opportunity to clarify to what extent each witness's name appeared in the police reports, in order to determine whether the evidence provided by the witness could have been procured before trial with due diligence.

Further, we conclude that Wilson has raised important issues of material fact by submitting Ernest's affidavit. The affidavit raises serious questions about the scientific methods used by the police department and the opinion testimony the police officer gave based on his use of these methods. The officer intimated that it was standard protocol to use the cautery probe to determine if particles are gunpowder, stating, "[o]nce you find them, the only way to tell if they are really gunpowder is

they usually touch them with a cautery probe." Throughout his testimony, the officer used the word "we" and "they" to refer to all of the tests he performed. While it is unclear to whom he was referring, at the very least, he was referring to himself and other forensic scientists. Ernest's sworn statement, if true, indicates that the officer's testimony may have been inaccurate or even unfounded because, unlike the officer, Ernest swore that there is no FBI protocol to use the cautery probe, and that the cautery probe test is not commonly used by modern crime labs.

Further, the officer testified that based on viewing the specks and using the cautery probe, but without documenting their size, shape, or color, he was 99.9 percent certain that the specks were gunpowder and that to his knowledge, nothing other than gunpowder would vaporize upon being touched by a cautery probe. In contrast, Ernest swore that forensic scientists generally photograph particles before they destroy them and examine them for size, shape, and color. Additionally, Ernest swore that forensic scientists generally try to avoid destructive tests. Ernest also listed numerous substances that the specks could have been, all of which would have reacted in the same way to the cautery probe. As with Wallace's testimony, Wilson has raised sufficient questions as to the officer's testimony to create genuine issues of material fact.

Next, we address Wilson's argument with respect to the fingerprint found on the bottle. We conclude that the fact that the fingerprint on the bottle does not match Wilson's fingerprints would not, standing alone, warrant a postconviction hearing. But in light of the fact that we are remanding this case to the postconvic-

tion court for an evidentiary hearing, the postconviction court should consider the fingerprint evidence along with the other evidence originally presented to the court.

We conclude that when a petitioner raises genuine issues of material fact, as Wilson did here, it is an abuse of discretion for the postconviction court to fail to hold an evidentiary hearing. And as noted earlier, an evidentiary hearing is particularly important in the context of a circumstantial case. *Opsahl II*, 677 N.W.2d at 423. Therefore, we hold that the postconviction court abused its discretion when it denied Wilson an evidentiary hearing.[4]

Reversed and remanded for an evidentiary hearing.

---

**4.** Having decided to remand this case to the postconviction court for an evidentiary hearing, we conclude that at this time it is not

necessary for us to address the issues Wilson raises in his pro se brief.