*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-0297**

State of Minnesota,
Respondent,

vs.

Jacob Carl Smith,
Appellant.

**Filed August 26, 2024**
**Affirmed in part, reversed in part, and remanded**
**Cochran, Judge**

Rice County District Court
File No. 66-CR-20-2502

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Brian M. Mortenson, Rice County Attorney, Sean R. McCarthy, Assistant County Attorney, Faribault, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, St. Paul, Minnesota; and

Andrew C. Wilson, Special Assistant Public Defender, Wilson & Clas, Minneapolis, Minnesota (for appellant)

        Considered and decided by Ede, Presiding Judge; Segal, Chief Judge; and Cochran, Judge.

**COCHRAN**, Judge

Appellant Jacob Carl Smith was convicted of two counts of assault arising out of a brawl at a parking lot. Smith filed a postconviction petition requesting a new trial based on two pieces of newly discovered evidence: a video recording of the brawl and a new witness. The district court summarily denied the petition based on its determination that the petition and record conclusively established that Smith is not entitled to postconviction relief.

On appeal, Smith argues that the district court abused its discretion by denying his postconviction petition without conducting an evidentiary hearing to determine if the newly discovered evidence entitles Smith to the requested relief. We first conclude that the district court did not abuse its discretion by denying Smith an evidentiary hearing on the newly discovered video recording. Next, with regard to the newly discovered witness, we conclude that Smith is entitled to an evidentiary hearing. Accordingly, we affirm in part, reverse in part, and remand for an evidentiary hearing.

## FACTS

In November 2020, respondent State of Minnesota charged Smith with one count of felony second-degree assault in violation of Minnesota Statutes section 609.222, subdivision 1 (2020), and one count of misdemeanor fifth-degree assault in violation of Minnesota Statutes section 609.224, subdivision 1(2) (2020). The charges were based on allegations that Smith participated in a brawl in a public parking lot in Faribault. According to the complaint, Smith hit E.R. in the face and stomped on E.R. after he fell to the ground.

The complaint further alleged that, when a friend attempted to help E.R., Smith struck the friend with a bat or baton. Smith pleaded not guilty, and the case proceeded to a jury trial.

*Trial*

At trial, the state called several witnesses who were present at the brawl. Their testimony established that, on November 1, 2020, two seventeen-year-old high school students planned to fight each other at the parking lot. The opponents, J.L. and L.M., were each accompanied by a group of similarly-aged friends. J.L. arrived first, accompanied by his friends E.R., J.J.S., and L.D. L.M. and a group of friends arrived shortly thereafter. The event also drew spectators, including A.F. and J.S.S.

According to witnesses, while the group was waiting for the fight to begin, a man arrived in a sedan. The witnesses consistently described the man as wearing dark-colored clothing, and J.S.S. and A.F. specifically testified that the man was wearing a Champion-brand sweatshirt. J.J.S., L.D., and J.L. testified that the man appeared older than the high school students who were already at the parking lot. At trial, two witnesses identified Smith as the man that they saw at the brawl wearing dark-colored clothing.

One of the assault victims, E.R., testified that the man approached him after he arrived and asked, "You want the smoke?" Before E.R. could answer, the man punched E.R. in the head. E.R fell to the ground, and several people—including the man—started punching and kicking E.R. Then, E.R.'s friend, J.J.S., hit the man. The man responded by striking J.J.S. in the head with a metal baton. At trial, E.R.'s friends, J.J.S. and J.L., described these events similarly.

3

The witnesses also testified that J.J.S. was bleeding after the man struck him with the metal object. E.R. described blood "going down [J.J.S.'s] face . . . and . . . puddling up on the ground. It got all over his shoes." Similarly, J.J.S. testified that he "was bleeding a lot" and went to the emergency room where doctors used "four staples" to close the wound. The state offered photographs depicting J.J.S.'s bleeding head injury and blood on the pavement at the parking lot.

The jury also heard testimony from A.F., who testified as follows. A.F. was at the parking lot and saw the man arrive in a Ford Focus. A.F. then observed the man strike two individuals, including one with a metal object. After hitting those individuals, the man came running towards the group of people that A.F. was standing with and yelled, "I'm gonna beat you!" At that point, she and her boyfriend got into her car. The man then came over to her car, hit the car with the metal object, and returned to his car. When the man stopped hitting her car, A.F. and her boyfriend drove away. She called 911 from the passenger seat while her boyfriend followed the man in his Ford Focus. According to A.F., they followed the man until he turned his car into a driveway. Just after they passed him, he backed out of the driveway and started following them. During this time, A.F. was still on the phone with the 911 dispatcher. Shortly thereafter, a police vehicle came up behind the man's car and the officer pulled over the car. A.F. also testified that the car that police pulled over was the same Ford Focus that she saw at the parking lot.

A.F.'s boyfriend, J.S.S., also testified. He recalled that a man wearing a Champion sweatshirt hit A.F.'s car with a metal rod and then the couple drove off. J.S.S. was "stunned" by what happened and wanted to leave the parking lot "before something else

happen[ed]." According to J.S.S., he did not follow the man's Ford Focus out of the parking lot, and in that regard his testimony differed from that of A.F. But, like A.F., J.S.S. recalled seeing the man's car pull into a driveway. And he recounted that, after he and A.F. passed the driveway, the man's car pulled out and began following their vehicle. He also recalled that A.F. was on the phone with the police while the car was following their vehicle and that the police pulled over the car.

Officer S, a Faribault police officer, testified that he responded to A.F.'s 911 call. Officer S drove to the area, traveling in the opposite direction of A.F. Officer S first saw A.F.'s car and then saw the Ford Focus that A.F. reported on the 911 call. Officer S did a U-turn and pulled over the Ford.[1] Officer S spoke with the driver, who identified himself as Jacob Smith. Officer S observed that Smith—who was wearing a black Champion sweatshirt, gray sweatpants, and a black baseball cap—matched the 911 dispatcher's description of the person "in the vehicle who had been involved in the altercation" at the parking lot. Officer S asked Smith if he had any potential involvement in the altercation. Smith denied being involved, claiming that he was coming from his girlfriend's house when he was stopped. Upon further inquiry, Smith claimed that he had been coming from Faribault Foods.

Officer S then placed Smith under arrest and transported him to the local jail. There, Officer S collected Smith's clothing and took photographs of it. He also took photographs of Smith's knuckles because he "observed some injuries on his fingers." At trial, the state

---

[1] The state admitted a video recording depicting the traffic stop from Officer S's body-worn camera. The video is consistent with Officer S's testimony.

5

introduced into evidence the items of clothing that Smith was wearing when he was arrested—a black hoodie with a Champion logo, grey sweatpants that were stained by droplets of red liquid, and white sneakers with red marks on the sides—as well as photographs of Smith taken at the time of arrest. Officer S testified that the red stains on the sweatpants and red marks on the shoes were consistent with blood. Officer S also testified the injuries on Smith's knuckles, shown on the photographs, were "consistent with somebody who would be using a fist to strike or hit something."

The state also called another Faribault police officer, Officer C, to testify. Officer C explained that he initially responded to the location where Officer S had pulled over Smith. From there, he proceeded to the parking lot where the brawl had occurred because A.F. had returned to that location. When he arrived, he saw A.F. with a group of individuals. A.F. had a metal pipe in her hand, which she provided to Officer C. She also told Officer C that there was "a physical altercation between some people and . . . her car got damaged." Officer C noted that A.F. "point[ed] out some red bodily substance fluid on the ground . . . and damage to her vehicle." Defense counsel asked if anyone at the parking lot had provided Officer C with a video recording of the brawl or if he asked for such a video. Officer C said no to both questions.

After the questions about a potential video recording, the state made a motion in limine "to prevent any speculation . . . that somebody may have been recording" because the insinuation could confuse the jury. The court denied the motion. Defense counsel then commented that, "I can assure the [s]tate that at no point am I going to insinuate that anybody did take video of the fight that happened. We don't know that."

Smith then testified in his own defense. Smith testified that, on the evening in question, he let his second cousin, R.G., borrow his Ford Focus to buy marijuana. Smith stated that he stayed home while R.G. used his car. R.G. took longer than expected—about 40 minutes—so Smith confronted R.G. in the driveway when he returned. While they were talking, a car began honking outside the driveway. Smith thought it was his girlfriend who was honking at him. Smith was married at the time, and his wife was in the house. Because Smith did not want his wife to see his girlfriend, he "jumped in [his] car" to "chase her" away and then "followed her." When Smith realized that his girlfriend was not in the car that he was following, he started back towards his house. Shortly thereafter, he was pulled over by police. Smith also testified that he looks like his second cousin, R.G., and that his family members dress alike and borrow one another's clothing. And Smith denied being at the parking lot where the brawl occurred.

On cross-examination, the state questioned Smith about inconsistencies between his testimony at trial and his statements to police officers on the night of the arrest. Smith admitted that, when he was pulled over, he told police that he was driving from his girlfriend's house near Faribault Foods and stated that he was not following anyone.

The jury found Smith guilty of second-degree assault for intentionally inflicting bodily harm on J.J.S. with a dangerous weapon and of fifth-degree assault for intentionally inflicting bodily harm on E.R.

*Post-Trial Litigation*

Following trial, Smith, represented by a different attorney, filed a motion for a new trial based on newly discovered evidence. The motion was supported by an affidavit from

7

his new attorney (motion counsel). Motion counsel averred that he recently received two pieces of new evidence: a video of the brawl and the name of an important new witness. Motion counsel stated that he received the new evidence from M.K. It is unclear from the record on appeal how or why M.K. contacted motion counsel.

Motion counsel also averred that an investigator with his office talked to the new witness, J.U., and prepared a report. According to motion counsel's affidavit, J.U. told the investigator that he was at the brawl where E.R. and J.J.S. were assaulted. J.U. also told the investigator that a relative of Smith's was at the brawl, but Smith was not. J.U. further stated that he was not interviewed by police or known to defense counsel. Motion counsel did not file the investigator's report or the new video with his affidavit.

The district court denied Smith's motion for a new trial, concluding it was untimely and did not meet the requirements for a new trial. The district court then sentenced Smith to 33 months of imprisonment for the second-degree assault offense but did not impose a sentence for the fifth-degree assault offense. Smith filed a direct appeal, and this court granted Smith's motion to stay his appeal to allow Smith to pursue postconviction relief.

Shortly thereafter, Smith filed a petition for postconviction relief seeking a new trial based on the same two pieces of newly discovered evidence. The petition specifically requested that the district court hold an evidentiary hearing on the petition. In support of the petition, Smith relied on motion counsel's previously filed affidavit. In addition, Smith filed the investigator's report and the newly discovered video evidence.

The investigator's report of the conversation with J.U. recounts the following. J.U. knows Smith through friends. J.U. was present at the brawl, but Smith was not there.

According to J.U., he knew Smith was not at the brawl because he saw "Cheetoh," Smith's brother or cousin, arrive at the parking lot in Smith's car without Smith. J.U. did not know Cheetoh's real name. J.U. also added that Cheetoh died a couple months after the incident.

The video evidence, which was filed with the petition, consists of a nine-second video that appears to show a portion of the brawl. The video begins with a person wearing a gray hoodie and light blue jeans throwing E.R. to the ground and punching him. Three other people then surround E.R., kick him while he is down, and run away. One of those three people matches the description of Smith provided at trial: he is wearing a black hoodie, grey sweatpants, and white shoes and he is holding a black baton. After the three people run away, the video shows a blue-jean-wearing individual punching E.R. a few more times.

After reviewing the new evidence and the postconviction petition, the district court summarily dismissed Smith's petition. In a written order, the district court concluded that, for both pieces of new evidence, the record conclusively establishes that Smith did not satisfy the criteria for a new trial. On that basis, the district court determined that Smith is not entitled to postconviction relief. Following the filing of the district court's order, this court reinstated Smith's appeal.

## DECISION

In this appeal, Smith challenges the district court's dismissal of his postconviction petition without conducting an evidentiary hearing on his claim of newly discovered evidence. We review a district court's denial of a postconviction petition, including the petitioner's request for an evidentiary hearing, for an abuse of discretion. *Tichich v. State*,

9

4 N.W.3d 114, 119 (Minn. 2024). In doing so, we review the district court's factual findings for clear error and its legal conclusions de novo. *Riley v. State*, 819 N.W.2d 162, 167 (Minn. 2012).

A district court must hold an evidentiary hearing on a postconviction petition "[u]nless the petition and the files and records of the proceeding conclusively show that the petitioner is entitled to no relief." Minn. Stat. § 590.04, subd. 1 (2022). The district court must "liberally construe" a postconviction petition, Minn. Stat. § 590.03 (2022), and resolve doubts about whether to conduct an evidentiary hearing in the defendant's favor. *Bobo v. State*, 820 N.W.2d 511, 516 (Minn. 2012). But "the allegations raised in the petition must be more than argumentative assertions without factual support." *Rainer v. State*, 566 N.W.2d 692, 695 (Minn. 1997).

To be entitled to an evidentiary hearing on a claim of newly discovered evidence, a postconviction petitioner must "allege facts that, if proven by a fair preponderance of the evidence, would satisfy the four-prong test set forth in *Rainer v. State*, 566 N.W.2d 692 (Minn. 1997)." *Bobo*, 820 N.W.2d at 517. Under *Rainer*, a petitioner is entitled to a new trial based on newly discovered evidence upon proving:

> (1) that the evidence was not known to the defendant or his/her counsel at the time of the trial; (2) that the evidence could not have been discovered through due diligence before trial; (3) that the evidence is not cumulative, impeaching, or doubtful; and (4) that the evidence would probably produce an acquittal or a more favorable result.

*Rainer*, 566 N.W.2d at 695. Consequently, if the petition fails to establish one or more of the *Rainer* prongs, an appellate court need not address the remaining prongs. *Tichich*, 4 N.W.3d at 121, n.5.

Smith argues that the district court abused its discretion by summarily dismissing his petition because, according to Smith, his petition adequately alleges facts that demonstrate both pieces of newly discovered evidence—the video recording and the witness testimony—satisfy all four prongs of *Rainer*. We address Smith's argument regarding each piece of evidence in turn, beginning with the video recording.

## I. The district court did not abuse its discretion by denying Smith an evidentiary hearing regarding the video recording.

Smith claims that the video recording is newly discovered evidence that warrants a new trial. He argues that the video "draws into question the validity of Smith's conviction for fifth-degree assault" because it contradicts testimony about how the brawl transpired. He notes that E.R.—the victim of the fifth-degree assault—testified that "the older man" punched him in the face, pushed him to the ground, and was kicking him, until J.J.S. punched the man. According to Smith, E.R.'s testimony is inconsistent with the newly discovered video because the video shows that the person who punches E.R. and throws him to the ground does not match the witnesses' description of the individual alleged to be Smith (or the man driving the Ford Focus). The video then shows three other people, including the individual alleged to be Smith, kicking E.R. while he is on the ground and then running off. But, based on its review of the video, the district court concluded that the video satisfied none of the *Rainer* prongs.

Because the district court correctly concluded that the new video recording fails to meet the third and fourth *Rainer* prongs, we limit our analysis to these two prongs. *See Tichich*, 4 N.W.3d at 121, n.5. Under the third *Rainer* prong, Smith must establish that the video is not cumulative, impeaching, or doubtful. *Bobo*, 820 N.W.2d at 518. The record supports the district court's determination that the newly discovered video recording does not meet this prong because the video is cumulative of other evidence. The video appears to depict a nine-second clip of the brawl, an event which four witnesses described at trial in great detail. Consequently, the video offers an account of the brawl which is cumulative to the substantial testimony admitted at trial. And, to the extent that the video is inconsistent with E.R.'s testimony, the video is merely impeaching. Therefore, the district court did not abuse its discretion when it found that the third *Rainer* prong was not satisfied with regard to the new video evidence.

Similarly, we discern no abuse of discretion by the district court in its analysis of the fourth prong. Under the fourth *Rainer* prong, Smith must allege facts that show that the new evidence is likely to produce an acquittal or more favorable result. *Id.* This prong requires "examining the admissibility and weight of the evidence at issue and considering it in light of the evidence the [s]tate admitted at trial." *Miles v. State*, 840 N.W.2d 195, 202 (Minn. 2013) (quotation omitted). At trial, the state presented evidence that Smith was wearing a black hoodie, grey sweatpants, and white sneakers on the night of the brawl. The new video evidence shows a man who is wearing similar clothing while engaged in conduct that is consistent with guilt on both charges. The video shows the man kicking E.R. on the ground, which is consistent with Smith's guilt for fifth-degree assault. *See* Minn. Stat.

12

§ 609.224, subd. 1(2) (defining fifth-degree misdemeanor assault as "intentionally inflict[ing] or attempt[ing] to inflict bodily harm upon another"). And the video shows the man holding a metal baton which, according to witness testimony, was the type of object that Smith used to strike J.J.S. in the head. Thus, the video is also consistent with Smith's guilt for second-degree assault. *See* Minn. Stat. § 609.222, subd. 1 (defining second-degree assault as "assault[ing] another with a dangerous weapon").

The state also presented evidence from Smith's person which is consistent with Smith having been in a brawl. The district court admitted a photograph showing that Smith's knuckles were injured, and Officer S testified that Smith's knuckles "appear[ed] consistent with somebody who would be using a fist to strike or hit something." Further, the clothing Smith was wearing when he was arrested appeared to have blood stains, and witnesses testified that J.J.S. was bleeding from being struck with the baton. Given the evidence presented by the state, the new video evidence is unlikely to produce a more favorable result.

In sum, because allegations in Smith's postconviction petition relating to the new video evidence do not satisfy the third and fourth prongs of the *Rainer* test, the district court did not abuse its discretion by denying Smith an evidentiary hearing regarding whether this evidence warrants a new trial.

## II. The district court abused its discretion by denying Smith an evidentiary hearing regarding J.U.'s testimony.

Smith also argues that the district court abused its discretion by summarily denying his petition regarding the newly discovered witness, J.U. With regard to this argument, we

agree. Because the postconviction petition satisfies all four prongs of the *Rainer* test regarding this newly discovered evidence, the district court abused its discretion when it summarily dismissed the petition and denied Smith's request for an evidentiary hearing regarding J.U.'s potential testimony. Below we address the *Rainer* prongs, beginning with the first two.

*Prongs One and Two*

To satisfy the first two prongs of the *Rainer* test, Smith's petition must allege facts which, if proven, would establish that the newly discovered evidence was not known to Smith or his counsel at the time of trial and that the evidence could not have been discovered through due diligence before trial. *Bobo*, 820 N.W.2d at 518. Smith's postconviction petition sets forth allegations meeting these two prongs. The petition explains that, following the trial, the defense counsel learned of J.U.'s testimony from M.K., a third party who was unknown to the defense at the time of trial. Smith's petition relies on an affidavit submitted by Smith's motion counsel, who took over from trial counsel due to a conflict. The affidavit states that J.U. was not interviewed by the police or listed as a witness by the state. The affidavit also states that J.U. was not known to trial counsel until they received the tip from M.K., as indicated by the lack of any notes about J.U. in the case file prior to motion counsel taking over.

Despite these allegations, the district court determined that Smith had not satisfied the first two *Rainer* prongs because Smith did not submit his own affidavit or an affidavit from his trial counsel but instead relied on an affidavit from motion counsel. On this basis,

14

the district court determined that it "cannot find that [J.U.] could not have been discovered through due diligence by [Smith] or [Smith's] trial counsel."

We conclude that the district court abused its discretion in this regard because Smith's petition contained factual allegations which, if proven at the evidentiary hearing, are sufficient to meet the first two prongs of *Rainer*.  In his postconviction petition, which courts must "liberally construe," Smith was only required to allege facts which demonstrated that he was entitled to relief.  Minn. Stat. §§ 590.03, .04, subd. 1.  Smith's allegations in his petition—that Smith and counsel did not know about J.U.'s testimony at the time of trial and that he could not have obtained it through due diligence—were sufficient to warrant an evidentiary hearing.  We recognize that the district court may have questions about whether due diligence could have revealed J.U.'s testimony, and it may have preferred to review an affidavit from Smith or his trial counsel rather than Smith's motion counsel.  But at this stage of the proceeding, the district court was required to accept the allegations in the petition as true and liberally construe them in Smith's favor.  Minn. Stat. § 590.03; *Bobo*, 820 N.W.2d at 516.  The district court abused its discretion by failing to do so.  *See Wilson v. State*, 726 N.W.2d 103, 107 (Minn. 2007) (holding that the district court abused its discretion when it failed to hold an evidentiary hearing on newly discovered evidence including witness testimony and noting that a postconviction hearing would give the district court an opportunity to determine "whether the evidence provided by the witness could have been procured before trial with due diligence").

15

*Prong Three*

We next consider the third *Rainer* prong. Under the third prong, Smith must show that the newly discovered evidence is not cumulative, impeaching, or doubtful. *Tichich*, 4 N.W.3d at 121.

According to Smith's motion counsel, J.U. would testify that Smith was not present at the brawl and that he saw Smith's "brother or cousin named Cheetoh" arrive at the parking lot where the brawl occurred in Smith's car. At trial, Smith testified that his second cousin, R.G., had borrowed his car on the evening in question.

The district court concluded that J.U.'s potential testimony was cumulative of Smith's testimony. The district court reached this conclusion for two reasons. First, the court reasoned that J.U. identified two possible alternative perpetrators—"either [Smith's] brother or [Smith's] cousin named Cheetoh"—so "the evidence only puts forward a general alternative perpetrator theory," which Smith already presented at trial. Second, the district court determined that, even if J.U. identifies a specific person, J.U.'s testimony is still cumulative because it provides another alternative perpetrator theory.

The supreme court has clarified when evidence of a specific alternative perpetrator is cumulative. In *Bobo*, the defendant presented evidence at trial that one specific person committed a shooting instead of him. 820 N.W.2d at 518. After he was convicted, the defendant petitioned for postconviction relief on the grounds that another specific person confessed to the shooting. *Id.* at 514-15. The supreme court concluded that the new testimony was not cumulative because it was the only evidence that the second alternative perpetrator committed the crime. *Id.* at 518-19.

16

Here, we conclude that J.U.'s testimony is not necessarily cumulative of Smith's testimony. First, Smith did not explicitly make an alternative perpetrator argument at trial. He did not testify that his second cousin, R.G., assaulted E.R. or J.J.S., and defense counsel did not imply as much in closing argument. Even if Smith had made an alternative perpetrator argument at trial, J.U.'s testimony may provide evidence of a different alternative perpetrator—Smith's "brother or cousin named Cheetoh." Under similar circumstances in *Bobo*, the supreme court concluded that evidence of a new possible perpetrator was not cumulative. *Id.* In addition, J.U.'s testimony is substantively distinct from Smith's testimony regarding R.G. At trial, Smith testified that he let R.G. borrow his car to go buy marijuana. By contrast, J.U. would testify that he actually saw Cheetoh drive Smith's car to the parking lot where the assaults occurred. Therefore, J.U.'s testimony would be the only evidence that Smith's relative, Cheetoh, was present at the parking lot. For these reasons, we conclude the district court abused its discretion when it determined that J.U.'s anticipated testimony would be cumulative of Smith's testimony at trial.

Moreover, J.U.'s anticipated testimony also meets the third prong because the anticipated testimony is not merely impeaching or doubtful. Rather, J.U.'s anticipated testimony—that Smith was not at the brawl—would be direct evidence of Smith's actual innocence. And while the report containing J.U.'s anticipated testimony is not particularly detailed, it contains plausible factual allegations which are not doubtful as a matter of law. *See Wilson*, 726 N.W.2d at 107 (explaining that a postconviction hearing is "exactly the forum" to elicit details and examine truthfulness of witness testimony). In sum, we conclude that the allegations regarding J.U.'s anticipated testimony, if assumed to be true,

17

satisfy the third prong of the *Rainer* test. Consequently, the district court abused its discretion in its analysis of this prong.

*Prong Four*

Finally, we address the fourth prong of the *Rainer* test. To meet the fourth prong, Smith's petition must allege that J.U.'s testimony would produce an acquittal or a more favorable result in light of the evidence the state admitted at trial. *See Miles*, 840 N.W.2d at 202. The district court determined that the testimony would not "produce a more favorable result by a fair preponderance of the evidence" for two reasons: the jury rejected "the exact theory of an alternative perpetrator that [J.U.'s] testimony would support," and the physical evidence is consistent with Smith's guilt.

We initially note that, in determining Smith had not met the fourth prong, the district court appears to have misstated the legal standard for when a postconviction petitioner is entitled to an evidentiary hearing. At the petition stage, the petitioner is required to "allege facts that, *if proven by a fair preponderance of the evidence*, would satisfy" the *Rainer* test. *Bobo*, 820 N.W.2d at 517 (emphasis added). "The showing required for an evidentiary hearing is lower than that required for a new trial. Any doubts about whether to conduct an evidentiary hearing should be resolved in favor of the defendant." *Id.* at 516 (citation omitted). It is not until the evidentiary hearing that the petitioner must establish the facts alleged in the petition "by a fair preponderance of the evidence." Minn. Stat. § 590.04, subd. 3 (2022).

On this record, we conclude that the district court abused its discretion when it determined that Smith had not met his burden of demonstrating that J.U.'s anticipated

18

testimony would produce a more favorable result. As noted above, Smith alleged that J.U. would testify that J.U. was present when the assaults occurred and that Smith *was not* present. J.U. would also testify that he saw Cheetoh, Smith's brother or cousin, arrive at the parking lot where the assaults occurred in Smith's car. Further, at trial, Smith testified that he and his relatives dress alike. If a fact-finder were to find J.U.'s testimony is credible, the fact-finder could infer that Cheetoh was the perpetrator of the assaults and Smith would probably be acquitted. *Cf. Bobo*, 820 N.W.2d at 520 (presuming that alternative perpetrator testimony is credible to determine that petitioner was entitled to evidentiary hearing). To be sure, J.U.'s testimony would be considered alongside the considerable evidence admitted by the state at trial. But J.U.'s testimony goes to the core factual dispute at trial: whether or not the person identified by witnesses was Smith. And "the identification of a specific alternative perpetrator is an important, powerful, and distinct part of a defendant's constitutional right to present a complete defense." *Bobo*, 820 N.W.2d at 518-19.

Because Smith's petition satisfies all four *Rainer* factors regarding J.U.'s anticipated testimony, Smith should have been afforded the opportunity to present that testimony at an evidentiary hearing. *See* Minn. Stat. § 590.04, subd. 1. The district court abused its discretion by denying Smith that opportunity.

*Conclusion*

In sum, we conclude that the district court did not abuse its discretion when it determined that Smith failed to allege facts regarding the new video evidence that, if proven, would satisfy the *Rainer* test. But we reach a different conclusion regarding J.U.'s

anticipated testimony that Smith was not present when the assaults of E.R. and J.J.S. occurred. Because the petition alleged facts sufficient to meet all four prongs of the *Rainer* test regarding J.U.'s anticipated testimony, an evidentiary hearing is required to evaluate whether Smith is entitled to a new trial based on that newly discovered evidence. Accordingly, we affirm the portion of the district court's summary denial of Smith's postconviction petition relating to the new video evidence, reverse the court's summary denial of Smith's postconviction petition relating to J.U.'s anticipated testimony, and remand for an evidentiary hearing on Smith's claim that J.U.'s anticipated testimony constitutes newly discovered evidence under the *Rainer* test.

**Affirmed in part, reversed in part, and remanded.**